# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **MICHAEL POPE, JR.,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | Case No.: 2:20-cv-01399-RDP |
| } | |
| **SHAMARION DOZIER and MERRILL** } | |
| **SHOULDERS,** } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION

This matter is before the court on Defendants' Motion for Summary Judgment. (Doc. # 66). The motion is fully briefed and ripe for review. (Docs. # 67; 68; 75; 76; 80). For the reasons explained below, Defendants' Motion is due to be granted in part and denied in part.

**I.      Background**[1]

Plaintiff Michael Pope, Jr. is a federal prisoner who was formerly incarcerated at Limestone Correctional Facility ("Limestone") in the Alabama Department of Corrections ("ADOC") system. (Doc. # 34). Plaintiff claims that, on the night of June 28, 2020, he was beaten and stabbed by three other inmates.[2] (*Id.*). Plaintiff filed this action against the officers who were on duty that night,

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Some or all of the events in question may have occurred after midnight, meaning they actually took place in the early morning on June 29, 2020. Therefore, when the court refers to "the night of June 28, 2020" this may also encompass the early morning hours of June 29, 2020.

claiming that they failed to intervene to stop the attack and refused to provide medical care to Plaintiff after he was attacked. (*Id.*).

In the summer of 2020, Plaintiff was housed in Limestone's Restricted Housing Unit D ("Unit D"). (Doc. # 68 at 5 ¶ 5); (Doc. # 76 at 2 ¶ 5). Defendants Shamarion Dozier and Merrill Shoulders were correctional officers who worked in Unit D on the third shift, from 10 p.m. to 6 a.m. (Doc. # 68 at 5 ¶ 7); (Doc. # 76 at 2 ¶ 7).

Unit D housed maximum security inmates with a record of violence in prison. (Doc. # 76 at 10 ¶¶ 69-70); (Doc. # 67-2 at 10); (Doc. # 67-3 at 6-7, 18-20). All Unit D inmates were assigned "close custody" status. (Doc. # 67-6 at 14). According to Jeremy Pelzer, a Limestone lieutenant, "close custody is the highest level of custody you can have other than being on death row." (*Id.*). Because of this, inmates in Unit D were housed alone in separate cells and were not allowed out of their cells at the same time. (Doc. # 76 at 11 ¶¶ 71-72); (Doc. # 67-3 at 8). When a Unit D inmate was allowed out of his cell, he was supposed to be handcuffed behind his back and supervised by at least two guards. (Doc. # 76 at 11 ¶¶ 74-75); (Doc. # 67-3 at 14); (Doc. # 67-6 at 15). As a result of these precautions, inmate-on-inmate violence in Unit D was rare, as inmates did not normally have the opportunity to interact outside of their cells. (Doc. # 67-6 at 16).

Sunday, June 28, 2020, however, was not a normal day in Unit D. During the day shift, several inmates broke the sprinkler heads in their cells, which caused flooding throughout the dormitory. (Doc. # 68 at 6 ¶ 9); (Doc. # 76 at 3 ¶ 9); (Doc. # 75-2 at 5). This was done to protest living conditions in Unit D. (Doc. # 76 at 13 ¶¶ 98-99); (Doc. # 75-2 at 9).

One of the leaders of this protest was Unit D inmate Satarus Smith.[3] (Doc. # 76 at 11 ¶ 77); (Doc. # 67-2 at 13); (Doc. # 75-2 at 9). Smith was believed to be the leader of all factions of the

---

[3] While at Limestone, Smith went by the nickname "Little Lewis." (Doc. # 76 at 11 ¶ 77); (Doc. # 67-2 at 13); (Doc. # 75-2 at 9).

Crips gang within the ADOC, and prison officials considered him one of the most dangerous inmates in the Alabama prison system. (Doc. # 76 at 11 ¶¶ 78-79); (Doc. # 67-6 at 9, 19); (Doc. # 75-1 at 12); (Doc. # 75-20).

On the day of the protest, Plaintiff got into an argument with Smith. (Doc. # 68 at 6 ¶ 11); (Doc. # 76 at 3 ¶ 11). Plaintiff—who was not part of the protest—was angry because water from the broken sprinklers flooded his cell and damaged some of his property. (Doc. # 76 at 13 ¶ 101); (Doc. # 75-2 at 9). Plaintiff was further upset when he slipped on water in his cell and fell down. (Doc. # 75-22 at 2). After his fall, Plaintiff yelled at Smith from inside his cell and called Smith a "bitch." (Doc. # 68 at 6 ¶ 11); (Doc. # 76 at 3 ¶ 11, 13 ¶¶ 101-02); (Doc. # 75-2 at 9). Before this, Plaintiff had no prior negative relationship with Smith. (Doc. # 68 at 6 ¶ 12); (Doc. # 76 at 3 ¶ 12). There is no evidence that Defendants or any other correctional officers were aware of the argument.[4]

About 20 or 30 minutes later, Plaintiff went to the infirmary to get checked out due to his fall. (Doc. # 68 at 6 ¶ 13); (Doc. # 76 at 3 ¶ 13); (Doc. # 75-22 at 2). He was given acetaminophen and escorted back to Unit D, where he was locked back into his cell. (Doc. # 67-4 at 2); (Doc. # 67-1 at 16-17). The medical records from this visit make no mention of Plaintiff having facial bruising, stab wounds, or any other injuries. (Doc. # 67-4 at 2); (Doc. # 76 at 14 ¶ 104); (Doc. # 75-8).

---

[4] Plaintiff argues that Defendants must have been aware of the argument because they would have been informed about it by day shift officers they relieved during the shift change. (Doc. # 76 at 14 ¶¶ 107-09). However, Plaintiff has not pointed to the summary judgment evidence indicating that the day shift officers were aware of the argument. Without such evidence, there is no Rule 56 basis for inferring that those officers told Defendants about the argument.

This all occurred before Defendants came on duty, as their shift did not begin until 10 p.m.[5] (Doc. # 68 at 5-6 ¶¶ 7, 15); (Doc. # 75-22). When Defendants arrived in Unit D, they encountered a chaotic scene; water was rushing out of several cells, the dorm was flooded, and multiple inmates were out of their cells attempting to clean up. (Doc. # 68 at 6 ¶ 16); (Doc. # 76 at 3 ¶ 16); (Doc. # 67-3 at 27). This included both general population inmates and Unit D inmates. (Doc. # 68 at 6 ¶ 17); (Doc. # 76 at 3 ¶ 17); (Doc. # 67-3 at 27). Officer Shoulders was concerned about the commingling of inmates of different security levels, so he had the general population inmates return to their own housing section. (Doc. # 68 at 7 ¶ 20); (Doc. # 76 at 4 ¶ 20). What happened next, however, is in dispute.

According to Plaintiff, after Officer Shoulders sent the general population inmates away, Defendants allowed eight to ten Unit D inmates out of their cells at the same time, without handcuffs or shackles. (Doc. # 76 at 14 ¶ 111); (Doc. # 67-1 at 17); (Doc. # 75-2 at 5, 10-11, 13-13). This included both Plaintiff and Satarus Smith. (Doc. # 76 at 15 ¶ 112-14); (Doc. # 67-1 at 18-19); (Doc. # 75-2 at 5, 11).

On the other hand, Defendants claim that they put all of the Unit D inmates back into their cells, then allowed them out of their cells one at a time—in handcuffs—to help clean up the flooding. (Doc. # 67-2 at 13-14); (Doc. # 67-3 at 29-30). And, Defendants testified that they never allowed Plaintiff or Smith out of their cells at any point that night. (Doc. # 67-2 at 14-15); (Doc. # 67-3 at 31-32). While Officer Dozier testified definitively that he did not allow Satarus Smith out of his cell, Officer Shoulders testified that he did not remember whether Smith was allowed out of his cell that night. (Doc. # 67-2 at 14); (Doc. # 67-3 at 32). Michael Peeks—an inmate who lived

---

[5] Officer Dozier was early for his shift that day, and he arrived in Unit D while Plaintiff was in the infirmary. (Doc. # 75-22); (Doc. # 67-3 at 28). Officer Shoulders arrived after Plaintiff returned from the infirmary. (Doc. # 75-22); (Doc. # 67-3 at 28).

4

in the cell next to Plaintiff's in Unit D—testified that he saw Defendants let both Plaintiff and Smith out of their cells on the night of the flooding. (Doc. # 75-2 at 4-5, 13).

Plaintiff states that he asked Defendants to let him out of his cell so that he could help clean up. (Doc. # 76 at 4 ¶ 22). At this point, according to Plaintiff, there were already multiple unrestrained inmates out of their cells, including Satarus Smith. (*Id.* ¶ 23); (Doc. # 67-1 at 19-22). However, Plaintiff was not troubled about being out of his cell and was not afraid of any of the inmates that were already out of their cells. (Doc. # 76 at 4 ¶ 23).

Plaintiff claims that, when he got out of his cell, Smith told Plaintiff that he wanted to meet and talk in Smith's cell. (Doc. # 67-1 at 19-22). Plaintiff agreed, and Smith asked Plaintiff to meet him there because he was going to talk to Officers Dozier and Shoulder first. (*Id.*). Smith then walked over to talk with Defendants, and Plaintiff walked in the same direction, towards Smith's cell. (*Id.*). At this point, Defendants were sitting at a table facing Smith's cell, about ten to fifteen feet away. (*Id.* at 20). Plaintiff was not afraid to talk to Smith because he did not believe Smith would try to hurt him in front of two correctional officers. (*Id.* at 22).

Plaintiff walked into Smith's cell, and when he turned around, he saw Smith and two other inmates coming into the cell and blocking the exit. (*Id.* at 21-22). Smith pulled out a homemade icepick and attempted to stab Plaintiff with it.[6] (*Id.*). Plaintiff blocked the first knife strike and began trying to escape the cell. (*Id.*). Smith then stabbed Plaintiff in the back of the head, and Plaintiff yelled out: "What the fuck? Y'all stabbing me?" (Doc. # 1 at 15). At some point, Plaintiff was knocked to the ground and lost consciousness. (*Id.*). When Plaintiff came to, Smith and the other inmates were kicking him in the face and repeatedly stabbing him in the back. (*Id.*). The cell

---

[6] An icepick is a piece of metal shaped like a pencil that is sharpened to a point with a handle on it. (Doc. # 75-2 at 12).

door remained open during the attack, and Plaintiff could see Defendants from inside the cell. (*Id.*); (Doc. # 67-1 at 20-21).

Plaintiff claims that Defendants watched the entire attack but did nothing. (*Id.* at 22). Defendants did not use the mace chemical spray they carried with them to break up the fight; they did not order the attackers to stop; nor did they call for help. (Doc. # 76 at 17 ¶¶ 140-42); (Doc. # 67-2 at 9). Defendants deny all of this and claim they never saw any part of the attack. (Doc. # 67-3 at 31); (Doc. 67-5 at 8).

According to Plaintiff, he eventually escaped the cell and made his way over to the table where Defendants were sitting. (Doc. # 67-1 at 22-23). Plaintiff was bleeding and visibly wounded; his lip was busted, his eye was swelling, and he had been stabbed about twenty times in his head, chest, and back. (*Id.* at 23). Plaintiff was not wearing a shirt when he was attacked, so the wounds on his chest and back were clearly visible. (*Id.* at 23).

Rather than taking him to the infirmary, Defendants took Plaintiff back to his cell, then briefly to the shower, and then back to his cell. (*Id.*). Plaintiff claims that he asked Defendants to take him to the infirmary, but Defendants threatened him by saying that he would be labeled a snitch if he went to the infirmary. (*Id.* at 15, 23-25).[7] Because of this, Plaintiff did not go to the infirmary on the day of the attack. (*Id.*).

---

[7] In his deposition, Plaintiff testified about the alleged threats:

Q. Once you got back to your cell did you say anything to either Shoulders or Dozier?

A. Yeah, I needed to go to the infirmary.

Q. What did they say?

A. They told me that if I got help that I'd be -- I'd get them in trouble.

Q. Who said that?

A. Both of them. At different times. They said that if I -- if I got -- if I made them take me to the infirmary, not only would I be getting the police in trouble but I'd be making them reveal who jumped in me, so I'd be snitching.

Inmate Michael Peeks was inside his cell when the alleged attack occurred, so he did not see what happened. (Doc. # 75-2 at 6). However, he did testify that sometime after Defendants let Plaintiff out of his cell Officer Dozier brought Plaintiff back to his cell, then took him briefly to the shower, and then returned him to his cell. (*Id.* at 6). Peeks noticed that Plaintiff was unusually quiet inside his cell, and he asked Plaintiff if he was okay, but Plaintiff said no and that he did not want to talk about it. (*Id.*).

A few days later, on July 2, 2020, Plaintiff was still in pain, so he asked Officer Shoulders again to take him to the infirmary. (Doc. # 67-1 at 26). According to Plaintiff, Officer Shoulders told him to say that he was suicidal and that his injuries were self-inflicted. (*Id.*). Plaintiff understood from their conversation that Officer Shoulders would not take Plaintiff to the infirmary unless he agreed, so he did. (*Id.*). When Plaintiff got to the infirmary, the nurse on duty saw Plaintiff's wounds and called a supervisor, who initiated an investigation. (*Id.*).

Defendants deny that they saw Plaintiff injured on the night of June 28, 2020. (Doc. # 67-3 at 38). Officer Shoulders testified that he did not notice Plaintiff's wounds until a few days later, when he observed some "marks" on Plaintiffs body while conducting a standard security check. (*Id.*). When he asked Plaintiff what happened, Plaintiff said he was suicidal, so Officer Shoulders took him to the infirmary. (*Id.* at 38-39). But, according to Officer Shoulders, Plaintiff did not mention anything about being stabbed nor did he give any explanation for his wounds other than that he was suicidal. (*Id.*).

Medical records and photographs from July 2, 2020 confirm that Plaintiff had about twenty puncture wounds extending from the back of his head and down his back and chest, as well as bruising around his right eye and redness on his left cheek. (Doc. # 67-5 at 5, 30-32); (Doc. # 75-

---

(Doc. # 67-1 at 23).

7

9); (Doc. # 75-18). When Plaintiff's injuries were photographed on July 2, 2020, they were not actively bleeding and were beginning to heal. (Doc. # 75-5 at 13); (Doc. # 75-18). In the records from the visit, Plaintiff's wounds are described as "superficial" and "pinpoints." (Doc. # 75-9 at 2); (Doc. # 67-5 at 5). A medical expert retained by Plaintiff stated: "The photographs reviewed for this Report, taken on 07/02/20, importantly show that Mr. Pope's wounds are not actively bleeding and in fact are closing and appear scabbed over which indicates that these wounds were not, at the time the photographs were taken, acute in nature and that significant healing had already taken place." (Doc. # 75-5 at 13). The expert also opined that Plaintiff's wounds were consistent with an assault and did not appear to be self-inflicted. (*Id.* at 12).

Additionally, in a recorded jail call placed on July 1, 2020, Satarus Smith discussed harming another inmate on the evening of June 28, 2020. (Doc. # 75-21 at 1:20-2:00). During the call, Smith stated, "Man, I shot another one. . . . an inmate this time." (*Id.*). In prison jargon, "shooting" can mean stabbing. (Doc. # 76 at 21 ¶ 188); (Doc. # 75-2 at 12-23); (Doc. # 75-1 at 20-21); (Doc. # 75-3 at 12). During the call, Smith explained that the inmate was "talking crazy behind the doors," and he also mentions "pulling the sprinklers" and inmates being let out of their cells. (Doc. # 75-21 at 1:20-2:00).

During the investigation of the attack, Scarlotte Robinson, one of the wardens at Limestone, referenced this phone call in an email she sent to another Limestone warden on Thursday July 9, 2020, stating:

> During our investigation of the incident with Inmate Michael Pope, he would never state who his alleged attacker was. Once he got to Donaldson today he provided the name of the inmate Satarus Smith #238889BU. Captain Langford has reviewed the phone calls made by Inmate Smith. Inmate Smith admitted on a phone call July 1, 2020, he "messed up" and he "shot another one". Inmate Smith spoke of the busted sprinkler heads and the inmate who tried to hang himself in the same phone call. When the Officers provided the names of the inmates whom they had allowed out, Inmate Smith's name was never given. During our questioning of them one Officer

8

> admitted to allowing two inmates out and the other admitted to allowing three inmates out. <u>It appears they have now lied during an investigation and Inmate Pope was assaulted by another CLOSE custody inmate.</u>

(Doc. # 75-14 at 2) (emphasis added).

On September 21, 2020, Plaintiff filed this action pursuant to 42 U.S.C. § 1983 against Officers Dozier and Shoulders.[8] (Doc. # 1). Defendants filed a Motion for Summary Judgment on January 27, 2023, seeking dismissal of all of Plaintiff's claims. (Doc. # 66).

## II.    Legal Standards

### A.    Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies this burden, the non-movant must then go beyond the pleadings and present affirmative evidence showing that there is a genuine issue for trial. *Id.* at 324; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116-17 (11th Cir. 1993).

---

[8] Plaintiff originally included Warden Robinson as a Defendant as well, but Plaintiff dismissed his claims against her by filing an amended complaint as a matter of course pursuant to Rule 15(a)(1) that alleged claims against Officers Dozier and Shoulders only. Fed. R. Civ. P. 15(a)(1)(B); (Doc. # 5).

When determining whether there is a genuine issue for trial, the court must view the evidence in the light most favorable to the non-moving party and must resolve all reasonable doubts and justifiable inferences in the non-movant's favor. *Anderson*, 477 U.S. at 255; *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1314 (11th Cir. 2007). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### B.   Qualified Immunity Standard

Qualified immunity shields government officials from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To be eligible for qualified immunity, an officer must first prove that he was acting within his discretionary authority when the alleged misconduct occurred. *E.g.*, *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022).

An officer acts within his discretionary authority when his behavior is "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998); *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018). An officer may still act within his discretionary authority even when violating the Constitution. *See Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). The relevant question is "whether the act complained of, if done for a proper purpose, would be within, or

reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert*, 157 F.3d at 1282 (quoting *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997)).

If the officer proves he was acting within his discretionary authority, then the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate by showing that (1) the officer violated a constitutional right; and (2) that right was clearly established at the time. *E.g.*, *Richmond*, 47 F.4th at 1179. Courts have discretion to decide which of these questions should be addressed first in light of the circumstances of the particular case at hand. *Pearson*, 555 U.S. at 236.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. at 236. There are three ways a right may be clearly established for qualified immunity purposes:

> (1) case law with indistinguishable facts clearly establishing the constitutional right, (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right, or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Crocker v. Beatty*, 886 F.3d 1132, 1137 (11th Cir. 2018) (per curiam) (internal quotation marks omitted) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009)). In the Eleventh Circuit, "only Supreme Court cases, Eleventh Circuit caselaw, and [state] Supreme Court caselaw can 'clearly establish' law." *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

At summary judgment, even when considering whether a right is clearly established, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). Rather, courts must "construe the evidence

11

in favor of the plaintiff and decide whether the defendant is entitled to qualified immunity under the plaintiff's version of the facts." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015). This means that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Id.* (citing *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009)). Nevertheless, courts must "view the facts from the plaintiff's perspective because the determinative issue . . . is 'not which facts the parties might be able to prove' but rather whether 'certain given facts' demonstrate a violation of clearly established law." *Id.* (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009) (per curiam)).

### III.   Discussion

Plaintiff alleges that Defendants violated the Eighth Amendment by failing to intervene while he was attacked and by preventing him from going to the infirmary until three days afterwards. (Doc. # 34). Plaintiff brings three Eighth Amendment claims against Defendants: (1) failure to protect (Count I); (2) deliberate indifference to a serious medical need (Count II); and (3) failure to intervene (Count III). (*Id.*). Defendants seek summary judgment on all three counts. (Doc. # 66). For the reasons explained below, Defendants are not entitled to summary judgment on Count I, but Counts II and III are both due to be dismissed.

### A.   **Plaintiff has presented sufficient evidence to survive summary judgment on his failure-to-protect claim.**

The Eighth Amendment imposes a duty on correctional officers "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1970) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). However, "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability." *Id.* at 834. Establishing an Eighth Amendment violation requires proving that a prison official was deliberately indifferent to a substantial risk of serious harm. *Id.* at 828.

To establish deliberate indifference, a plaintiff must show that (1) a substantial risk of serious harm objectively existed; (2) the official was subjectively aware of that risk; and (3) the official failed to respond to the risk in an objectively reasonable manner. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014); *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted). However, a "generalized awareness of risk" is insufficient to establish liability. *Carter*, 352 F.3d at 1350. Rather, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Here, Plaintiff claims that Defendants watched as three maximum-security inmates knocked Plaintiff to the ground, beat him repeatedly, and stabbed him approximately twenty times. (Doc. # 34). And Plaintiff claims that, despite having the ability to intervene, Defendants refused to take any action whatsoever to protect him. (*Id.*). These allegations, if proven, demonstrate that (1) Plaintiff objectively faced a substantial risk of serious harm; (2) Defendants were aware of that risk; and (3) Defendants failed to respond to the risk in an objectively reasonable manner. *See Caldwell*, 748 F.3d at 1099; *Carter*, 352 F.3d at 1349.

Defendants do not dispute that Plaintiff's allegations, if proven, establish deliberate indifference. Rather, Defendants argue that (1) there is no evidence that they witnessed the attack, and (2) even if they had seen the attack, they were not in a position to intervene. (Doc. # 68). Defendants' arguments fail because Plaintiff has provided sufficient evidence from which a jury

could find that Defendants watched the attack and failed to intervene despite having the ability to do so.[9]

Although there were no witnesses to the attack other than Plaintiff, his assailants, and (allegedly) Defendants, Plaintiff has provided evidence supporting his version of events. First, it is undisputed that Plaintiff sustained injuries consistent with an assault at some point between June 28 and July 2, 2020. Medical records and photographs from July 2, 2020 confirm that Plaintiff had about twenty puncture wounds extending from the back of his head and down his back and chest, as well as bruising around his right eye and redness on his left cheek. (Doc. # 67-5 at 5, 30-32); (Doc. # 75-9); (Doc. # 75-18). A medical expert retained by Plaintiff concluded that these injuries were not self-inflicted but rather were consistent with an assault. (Doc. # 75-5 at 12). Moreover, Plaintiff must have sustained these injuries at some time between his daytime visit to the infirmary on June 28, 2020—when no bruises or stab wounds were observed—and his visit to the infirmary three days later on July 2, 2020—when his injuries were first documented. (*Compare* Doc. # 75-8 *with* Doc. # 75-9).

There is also evidence that Defendants allowed Plaintiff and his attackers out of their cells on the night of June 28, 2020. Michael Peeks—the inmate in the cell next door to Plaintiff— testified that he saw Defendants let both Plaintiff and Satarus Smith out of their cells without

---

[9] However, to be clear, there is no evidence that Defendants knew of any specific risk to Plaintiff before the attack began. Indeed, Plaintiff himself was not aware of any danger before that point. By his own account, Plaintiff asked to be allowed out of his cell despite knowing that multiple other Unit D inmates were already out of their cells unrestrained, including Satarus Smith. (Doc. # 76 at 4 ¶¶ 22-23). In spite of his argument with Smith earlier in the day, Plaintiff voluntarily left his cell, and he went into Smith's cell willingly. (*Id.*). Plaintiff did not believe Smith posed any danger to him until Smith attacked him. (*Id.*). Accordingly, it is reasonable to understand that Defendants could not be expected to know of a risk that Plaintiff himself was unaware of. (*Id.*). While it is true that allowing multiple Unit D inmates out of their cells together violated Limestone policy, "merely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" *Carter*, 352 F.3d at 1350 (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam)); *Goodman v. Kimbrough*, 718 F.3d 1325, 1334 (11th Cir. 2013) ("[T]he fact that the officers deviated from policy or were unreasonable in their actions—even grossly so—does not relieve [the plaintiff] of the burden of showing that the officers were subjectively aware of the risk; in other words, he cannot say, 'Well, they should have known.'").

restraints that night. (Doc. # 75-2 at 4-5, 13). This is consistent with Plaintiff's claims. And, Defendants have not identified any other time besides June 28 on which the attack might have occurred.

Additionally, Plaintiff has provided evidence supporting his claim that Satarus Smith was the inmate who stabbed him. In a recorded jail call that occurred on July 1, 2020, Smith confides that he "shot" another inmate on the previous Sunday night. (Doc. # 75-21 at 1:20-2:00). Smith says that the inmate was "talking crazy behind the doors," and he also mentions "pulling the sprinklers" and inmates being let out of their cells. (*Id.*). Plaintiff produced evidence that the term "shooting" is often used by prisoners to mean "stabbing." (Doc. # 76 at 21 ¶ 188); (Doc. # 75-2 at 12-23); (Doc. # 75-1 at 20-21); (Doc. # 75-3 at 12). Plaintiff also produced an email in which a Limestone warden describes this recording and concludes, "[i]t appears [Defendants] have now lied during an investigation and Inmate Pope was assaulted by another CLOSE custody inmate." (Doc. # 75-14 at 2). A reasonable jury could therefore infer that Smith admitted to stabbing Plaintiff on the night of June 28, 2020.

Finally, Plaintiff testified that he saw Defendants watching the attack. (Doc. # 67-1 at 20-22). According to Plaintiff, the cell doors were open during the attack, and Defendants were sitting only ten to fifteen feet away. (*Id.*). Plaintiff also yelled out that he was being stabbed. (Doc. # 1 at 15). It is not entirely clear how long the attack lasted because Plaintiff briefly lost consciousness after being knocked to the ground. (*Id.*). But, the attack lasted long enough for Plaintiff to block Smith's first knife strike, attempt to escape, get stabbed in the back of the head, yell out, be knocked to the ground, pass out, wake up, be repeatedly kicked and stabbed (approximately twenty times) while on the ground, stand up, and eventually escape from the cell. (*Id.*). During this time, Plaintiff claims Defendants made no attempt to stop the attack: they did not try to break up the

fight; they did not use their mace chemical spray on the assailants; they did not call for backup; and they did not even order the attackers to stop. (*Id.*); (Doc. # 76 at 17 ¶¶ 140-42); (Doc. # 67-2 at 9). This evidence is sufficient to permit a jury to find that Defendants had the ability to intervene in the attack but chose not to. *See Woodyard v. Ala. Dep't of Corr.*, 700 F. App'x 927, 934 (11th Cir. 2017) (per curiam) (holding that a correctional officer was not entitled to summary judgment because reasonable jurors could find that the officer watched as an inmate was assaulted and did not immediately call for backup).

Based on the Rule 56 record, a reasonable jury could find that Defendants violated Plaintiff's Eighth Amendment rights by failing to intervene while Plaintiff was attacked. Furthermore, it is clearly established that Defendants' alleged conduct is unconstitutional. Eleventh Circuit "precedents have made clear, repeatedly, that the Constitution requires that prison officials take reasonable measures to protect the safety of the inmates." *Woodyard*, 700 F. App'x at 934. Moreover, the Eleventh Circuit has explicitly determined that "the Supreme Court made clear in *Farmer* that prison officials have a duty 'to protect prisoners from violence at the hands of other prisoners,' and that an official may be liable if he knows of and disregards a substantial risk of an inmate-on-inmate attack 'by failing to take reasonable measures to abate [the risk].'" *Scott v. Miami Dade County*, 657 F. App'x 877, 885 (11th Cir. 2016) (per curiam) (alteration in original) (citation omitted) (quoting *Farmer*, 511 U.S. at 847). Thus, any reasonable officer should have known that he could not, in keeping with that standard, refuse to take any action while watching an inmate being attacked. *See Woodyard*, 700 F. App'x at 934 (citing *United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.")). Accordingly, Defendants are not entitled to qualified immunity from Plaintiff's failure-to-protect claim.

> **B.** **Plaintiff's claim for deliberate indifference to a serious medical need is due to be dismissed because Plaintiff has not shown that the delay in receiving medical treatment exacerbated his injuries.**

"Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prove deliberate indifference based on the failure to provide medical care, a plaintiff must prove that (1) he had an objectively serious medical need; (2) the defendant acted with deliberate indifference to that need; and (3) the defendant's indifference caused the plaintiff's injury. *Id.*

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002). A prison official acts with deliberate indifference "when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (quoting *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)).

"Alternatively, '[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours.'" *Id.* (alteration in original) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). When determining whether a delay in medical treatment constitutes deliberate indifference, courts consider: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for delay." *Goebert*, 510 F.3d at 1327. "An inmate who complains that delay in medical treatment rose to a constitutional violation must

place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Hill*, 40 F.3d at 1187.

This is not a case in which Plaintiff received no medical treatment at all; rather, Plaintiff claims medical treatment was improperly delayed for three days. (Doc. # 34). Therefore, Plaintiff must demonstrate that this delay exacerbated his injuries. *See Hill*, 40 F.3d at 1187-88. However, the record does not support such a finding.

The undisputed evidence shows that when Plaintiff was taken to the infirmary on July 2, 2020, his wounds were not actively bleeding and were beginning to heal. (Doc. # 75-5 at 13); (Doc. # 75-18). In the records from that visit, Plaintiff's wounds are described as "superficial" and "pinpoints." (Doc. # 75-9 at 2); (Doc. # 67-5 at 5). Additionally, Plaintiff's own retained expert concluded that the photographs taken on July 2, 2020 "show that [Plaintiff's] wounds are not actively bleeding and in fact are closing and appear scabbed over which indicates that these wounds were not, at the time the photographs were taken, acute in nature and that significant healing had already taken place." (Doc. # 75-5 at 13). There is no evidence in the record indicating that Plaintiff's wounds required stiches, nor that they had become infected or otherwise exacerbated in any way by the delay in medical treatment. There is also no evidence that Plaintiff attended any follow-up visits for treatment of his injuries. Therefore, Plaintiff has not satisfied his obligation to provide "verifying medical evidence" establishing "the detrimental effect of the delay in medical treatment." *See Hill*, 40 F.3d at 1187. As such, Plaintiff has not met his burden to prove the existence of a genuine issue for trial on this claim, and Defendants are entitled to summary judgment. *See, e.g.*, *Celotex*, 477 U.S. at 324.

### C.     Plaintiff's failure-to-intervene claim is due to be dismissed.

In support of this claim, Plaintiff alleges that: (1) Defendants each saw the other fail to protect Plaintiff and act with deliberate indifference to Plaintiff's serious medical needs; (2) each had the opportunity to prevent the other from doing so; and (3) Defendants nonetheless each failed to take reasonable steps to prevent each other from failing to protect Plaintiff and failed to take reasonable steps to prevent each other from acting with deliberate indifference to Plaintiff's serious medical needs. (Doc. # 34 at 7).

"Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (per curiam) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)). "However, in order for liability to attach, the officers must have been in a position to intervene." *Id.* And, "[o]f course, a failure-to-intervene claim requires an underlying constitutional violation." *Williams v. Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023); *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed).

Accordingly, Plaintiff cannot maintain a failure-to-intervene claim based on Defendants' alleged failure to "prevent" each other from "ignoring" Plaintiff's serious medical needs. This is because, as discussed above, Plaintiff's claim for deliberate indifference to a serious medical need is due to be dismissed. So, there is no underlying constitutional violation to support the failure-to-intervene claim.

Plaintiff also alleges that Defendants each failed to intervene to stop the other from failing to protect Plaintiff from the attack. (Doc. # 34 at 7). Thus, Plaintiff asserts that each Defendant should have compelled the other Defendant to intervene in the attack. However, Plaintiff cites not

19

caselaw to support the proposition that a non-supervisory correctional officer may be held liable for failing to compel another officer to take action to protect an inmate. (Doc. # 76 at 30). Indeed, Plaintiff cites no caselaw supporting this claim at all. (*Id.*). Nor has Plaintiff identified what "reasonable steps" Defendants should have taken to "prevent each other from failing to protect Plaintiff." (Doc. # 34 at 7). Therefore, Defendants' are entitled to summary judgment on this claim.

### IV.    Conclusion

For the reasons discussed above, Defendants' Motion for Summary Judgment (Doc. # 66) is due to be granted in part and denied in part. It is due to be granted as to Count II (deliberate indifference to a serious medical need) and Count III (failure to intervene), and those claims are due to be dismissed. However, the Motion is due to be denied to the extent it seeks dismissal of Count I (failure to protect). A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this June 12, 2023.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE